Filed 5/16/22  P. v. Carmona CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B309272 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA110859) |
| v. | |
| EDUARDO CARMONA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Judith Levey Meyer, Judge.  Affirmed in part and remanded with directions.

Maria Morrison, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Michael R. Johnsen, Nicholas J. Webster, Julie A. Harris and Shezad H. Thakor, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

Eduardo Carmona was convicted of assault with a firearm (Pen. Code,[1] § 245, subd. (a)(2)) and possession of a firearm by a felon (§ 29800, subd. (a)(1)). On appeal, Carmona contends the evidence was insufficient to support his conviction; and, in the alternative, that resentencing is required because of recent amendments to the Penal Code. We affirm the conviction but remand for resentencing.

## FACTUAL AND PROCEDURAL BACKGROUND

In count 1 of the information, Carmona was charged with assault with a firearm, and in count 2 he was charged with possession of a firearm by a felon. The information contained a series of additional allegations pertaining to count 1. On this count, Carmona was alleged to have: (1) personally inflicted great bodily injury on Robert Huerta within the meaning of section 12022.7 subdivision (a); (2) personally used a handgun within the meaning of sections 12022.5, 1192.7, subdivision (c), and 667.5, subdivision (c); (3) suffered four prior convictions within the meaning of section 667.5, subdivision (b), served a qualifying prison term for the offenses, and then failed to remain free of prison and was convicted of a felony within five years; (4) suffered a serious felony conviction pursuant to section 667, subdivision (a)(1); and (5) suffered a prior conviction within the meaning of the "Three Strikes" law (§§ 667, subds. (b)-(j), 1170.12, subds. (a)-(d)).

A surveillance video from approximately 2:00 a.m. on December 8, 2018, showed Carmona and his girlfriend Hali Siverson walking into a convenience store, where Siverson

---

[1] All undesignated statutory references are to the Penal Code.

purchased a bag of chips and a drink.  Siverson and Carmona left the store.  Carmona walked to a car, a silver Kia, while Siverson encountered Huerta and his girlfriend Alicia at a video rental kiosk outside the store.

Huerta testified at trial, and the surveillance video showed, that he walked over to the video kiosk and spoke to someone.  Alicia and Siverson spoke with each other.  Watching the video, Huerta testified it appeared he and Siverson had an argument.  Siverson moved her hand toward Alicia.  When asked if Siverson tried to take Alicia's phone, Huerta responded, "I don't remember.  Something like that"; he then said he did not remember.  In the video Huerta raised his hand and moved in between the two women.  Huerta said the other woman kicked him.

Carmona left the car and approached Huerta, Siverson, and Alicia.  Carmona stood in front of Huerta and said something to him.  On the surveillance video, Huerta is shown putting his hands in the air and stepping back.  Huerta and Alicia appeared to flinch, and others in the area reacted, but Siverson and Carmona appeared unfazed.

The quality of the surveillance footage was insufficient to capture split-second images of gunfire, and no gun could be seen in the video.  However, Huerta did testify he was shot as he was talking with a person outside the store, and the footage showed Huerta lifting his left leg and then hobbling away from the kiosk toward the store entrance.  Huerta kept looking back toward the kiosk.  Alicia ducked behind the kiosk.  Carmona walked rapidly back toward the Kia.  Siverson approached Huerta and Alicia and appeared to say something final to them, then turned toward the vehicle.

Huerta had been shot in the left leg. He was treated by paramedics and transported to the hospital due to the gunshot wound.

At trial, Huerta testified Carmona was not the person who shot him, but he was uncooperative, gave inconsistent testimony, and claimed not to remember most details of the incident. Huerta testified he was shot as he was talking with a man. He did not know if Carmona was the man who approached him. He did not know if the man he talked to was in the courtroom at the time of trial. He did not know who shot him. He never saw a gun. He had no idea where the bullet came from. He did not know why he kept looking back as he hobbled toward the store. He denied looking back because he was looking in the shooter's direction, but when asked why he was looking back, he said, "Um, I don't know. I was probably like—I don't know. I just got shot."

Huerta, who was in custody at the time he testified, both admitted and denied knowing the meaning of the term "snitch." He testified the prosecution had brought him down from Northern California to testify, but then said he was there by his own choice because he wanted to tell everyone they had the wrong man. He claimed not to be intimidated by Carmona but then asked, "Can I go back to prison?"

Although Huerta testified he did not know or recognize Carmona, he admitted he may previously have told the defense investigator he might have played ball with Carmona when they were younger.

A detective testified that a person who cooperates with law enforcement is labeled a snitch. Snitches are put on a list and are targeted for retaliation that can range from an assault to

4

death.  Retaliation may take place in prison but also can occur once the snitch is released from custody.

The jury found Carmona guilty of both charged offenses, and also found true the allegations that he personally used a handgun within the meaning of section 12022.5, subdivision (a), and that he personally inflicted great bodily injury upon Huerta within the meaning of section 12022.7, subdivision (a).

Carmona waived a jury trial on his prior convictions and then admitted the priors alleged in the information.  At sentencing, on count 1, the court selected the high term sentence of four years because of Carmona's criminal record, then doubled it pursuant to the Three Strikes law.  The court selected the low term of three years for the sentence enhancement under section 12022.5, subdivision (a); it chose the low term "[b]ecause this is one of those rare charges where you can actually have a gun allegation when a gun is also part of the crime."  The court noted that it was aware it had the authority to strike this allegation, but based on Carmona's criminal history it saw no reason to do so.  Additionally, the trial court imposed a three-year term pursuant to section 12022.7 because the victim was injured.  Finally, the court stated it was aware it had discretion to strike the five-year term pursuant to section 667, subdivision (a)(1) but chose to impose it because Carmona had been in custody regularly and the public needed to be protected.  The court imposed the high term sentence on count 2, doubled pursuant to the Three Strikes law, but stayed that sentence under section 654.  Carmona's aggregate sentence was 19 years in state prison.  Carmona appeals.

# DISCUSSION

## I.   Sufficiency of the Evidence

Carmona argues the evidence presented at trial was insufficient to support convictions for assault with a firearm and possession of a firearm. " ' "When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Rangel* (2016) 62 Cal.4th 1192, 1212–1213.) We conclude the evidence is sufficient to support the convictions.

Carmona argues there was insufficient evidence that he had a gun, that he used a gun, that he was present at the moment Huerta was shot, or that he shot Huerta. Carmona is correct there was no testimony and no footage showing him carrying or firing a gun. However, a jury could reasonably infer, based upon the video evidence and the trial testimony, that Carmona shot Huerta. The surveillance video showed Alicia and Siverson speaking, Siverson making a move toward Alicia, and Huerta interceding between the two women. Carmona then approached, prompting Alicia to visibly flinch and Huerta to put his hands in the air and step backward. In contrast to Huerta

and Alicia, Siverson did not react at all. These reactions are consistent with, and allow a reasonable inference that, Carmona had the gun: Siverson had no reason to fear, because she was with Carmona, but Alicia recoiled and Huerta put his hands up and began to back away. Huerta was shot during this conversation. The parties' post-shooting actions also support the conclusion that Carmona was the shooter. Carmona hurried back to his car. Siverson, who did not fear the shooter, took a moment to walk toward Huerta and get in a final word before following Carmona. Alicia ducked away and behind the video kiosk. Huerta limped toward the entrance to the convenience store, looking back in Carmona's direction as he retreated.

Carmona likens his case to *People v. Blakeslee* (1969) 2 Cal.App.3d 831, 838 (*Blakeslee*), in which there was insufficient evidence to support a murder conviction when no one saw a shooting that occurred inside an apartment, no evidence placed the defendant in the apartment at the time of the shooting, and no one saw the defendant with a weapon. The defendant had a possible motive, made one possibly inculpatory remark, and lied about her whereabouts at the time of the crime, but there was no other evidence against her. (*Id.* at pp. 838–839.)

Carmona was far more directly connected to the crime here than the defendant in *Blakeslee*: The events surrounding the shooting were captured on surveillance video and the victim testified he was shot during his conversation. Evidence placed Carmona within feet of Huerta moments before Huerta was shot, everyone in the vicinity reacted consistently with Carmona being the shooter, Carmona promptly left the scene, and Huerta, shot in the leg, limped into the convenience store. Unlike the evidence in *Blakeslee*, the evidence here did "directly support an inference

7

that [the defendant] committed the crime." (*Blakeslee, supra,* 2 Cal.App.3d at p.838.)

Carmona contends there was no evidence he was present at the convenience store at the exact time of the shooting, but this is incorrect. Although Huerta either could not or would not identify the man he was speaking with, he testified the shooting occurred while he was speaking with the man he could not identify, and that he had just been shot at the time he hobbled back toward the store entrance. Carmona and Siverson were identified as the man and woman in the video with whom Huerta and Alicia interacted, and Huerta and Alicia were not seen interacting with any other people on the surveillance video of the events leading up to and immediately after the shooting. After the encounter with Carmona, an injured Huerta went back into the convenience store and Carmona hurriedly departed. Based on this evidence, a reasonable jury could conclude Carmona was present at the scene at the time of the shooting.

Carmona argues that even if the shooting occurred immediately after the confrontation between Carmona and Huerta, "it was indeed possible that there was at least one other individual in the parking lot who could have shot Huerta," and he notes that Huerta testified he thought the shot came from the parking lot. Huerta testified inconsistently: he testified both that the shot came from the parking lot and that he had no idea where the bullet came from. Juries may accept some parts of a witness's testimony and reject other parts. (*People v. Collins* (2021) 65 Cal.App.5th 333, 345.) The jury obviously rejected Huerta's testimony that he was shot by someone in the parking lot, as it was entitled to do. Huerta was eager to proclaim he had no idea who shot him but it certainly was not Carmona, and his

8

evasive and inconsistent testimony certainly permitted the inference that Huerta, afraid to identify Carmona, was lying in an attempt to protect himself from retaliation. Additionally, whether someone else was present at the scene who could possibly have shot Huerta does not undermine the conviction. "[W]hen two or more inferences can reasonably be deduced from the facts, a reviewing court is without power to substitute its deductions for those of the jury. It is of no consequence that the jury believing other evidence, or drawing different inferences, might have reached a contrary conclusion." (*People v. Brown* (1984) 150 Cal.App.3d 968, 970; see also *People v. Lindberg* (2008) 45 Cal.4th 1, 27.)

## II.    Assembly Bill No. 124

Assembly Bill No. 124, which was enacted after the sentencing hearing in this case and took effect on January 1, 2022, amended section 1170 by making the lower term the presumptive sentence for a term of imprisonment when certain conditions exist. (Stats. 2021, ch. 695, § 5.3, adding § 1170, subd. (b)(6).) Specifically, newly added subdivision (b)(6) of section 1170 provides:  "[U]nless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense: [¶] (A) The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence."  The parties agree, as do we, that Assembly Bill No. 124 applies retroactively and requires us to remand this matter for resentencing.

9

When Assembly Bill No. 124 went into effect on January 1, 2022, Carmona's judgment was not yet final. In *In re Estrada* (1965) 63 Cal.2d 740, 744–746, the California Supreme Court held that, absent evidence to the contrary, the Legislature intended amendments to statutes that reduce punishment for a particular crime to apply to all whose judgments are not yet final on the amendments' operative date. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344.) Here, Assembly Bill No. 124 operates to reduce punishment because it requires the imposition of a lower term under certain conditions. Nothing in the statutory language or legislative history of Assembly Bill No. 124 indicates the amendments to section 1170 were intended to apply only prospectively. We therefore conclude that Assembly Bill No. 124 is retroactive and applies to Carmona's case. (See *People v. Banner* (2022) 77 Cal.App.5th 226, 240 [holding Assembly Bill No. 124 applicable to all nonfinal cases on appeal].)

At Carmona's sentencing hearing, his older sister addressed the court and disclosed that Carmona had experienced severe childhood trauma. He was born addicted to heroin. His mother was a heroin addict and his father was incarcerated. Carmona experienced neglect, abandonment, and nutritional deprivation. He had been prescribed psychiatric medication starting at the age of four. On multiple occasions he and his sisters had to resuscitate their mother with cold bath water because she had overdosed on heroin. Carmona's mother died when he was 11 years old and his father committed suicide when Carmona was 14 years old.

Carmona was sentenced to the high term on both counts. Given the evidence that he experienced significant trauma in his childhood, it is possible that his trauma "was a contributing factor in the commission of the offense," requiring imposition of the lower term unless the aggravating circumstances outweigh the mitigating circumstances such that imposing the lower term sentence would be contrary to the interests of justice. (§ 1170, subd. (b)(6).) The trial court should therefore resentence Carmona, taking into account the changes made to section 1170, subdivision (b) by Assembly Bill No. 124.[2]

---

[2] Carmona asserted in other supplemental briefing that he is also entitled to resentencing under Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3), which established the middle term as the presumptive term when a statute specifies three possible terms of imprisonment; and Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1), which removed the former requirement that an act or omission that is punishable by multiple statutes be punished under the statute providing for the longest term of imprisonment. Our conclusion that Carmona must be resentenced because of Assembly Bill No. 124 makes it unnecessary to consider his alternative arguments in support of resentencing.

## DISPOSITION

The matter is remanded to the trial court for resentencing consistent with this opinion. In all other respects, the judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

STRATTON, Acting P. J.

We concur:


WILEY, J.



HARUTUNIAN, J.*

---

* Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.